Oral argument not to exceed 15 minutes per side. Ms. Masseron, DePellon, and DePellon. Good morning. May it please the Court. Mary Masseron on behalf of the City of Jackson, the defendant DePellon in this case. I'd like to reserve four minutes for rebuttal. This appeal presents the Court with three issues. I'm going to try to touch on all three. The question of the entry into the foyer area, the question of the shooting of the pit bull, and the state tort claims. With respect to the entry into the foyer area, I think we have briefed and continue to believe an entry into an unlocked door of a foyer area in a quadruplex, a multi-unit building, is not a violation of the Fourth Amendment. And the trial court was wrong in saying this is more like a single-family home when the record is clear that it's a four-unit multiplex. There certainly was a numbered address. And the record is very clear that in this area of Jackson there are many large homes that have been converted into apartments. Regularly the number on the outside doesn't correspond with the design of the multi-units on the inside. So certainly whether one concludes, certainly the officer's belief in entering what appeared to be a multi-unit foyer of an apartment building was reasonable as a matter of immunity. And that's probably the easier route to a decision for a reversal in this case, because it avoids the necessity of addressing the foyer question head on. But doesn't the record reflect that while this is a multi-unit building, or maybe one could call it a quadplex or something of that nature, there were these separate entrances. So 511 was its own separate entrance with its own address and doorbell. And 513 was not right next to 511 from what I can see from the pictures. It's got its own entrance and doorbell. And then the other two units you enter I think from the other side of the building. This is not a situation where you've got a door and you've got 507, 509, 511, 513 placards at that one door. What the officers see when they arrive, I think it is accurate to say, are two separate doors. But when the officer- 511 and 513. 511 and 513. The other addresses are not visible from where they are and the unit is a quadruplex. But I think Officer Garcia's testimony is very important here. He says the issue is some apartments aren't sanctioned as separate apartments. So you knock and it turns out it's not a normal building, but the building is multiple units, even though there aren't separate gas meters or separate numbers on the outside. That's in the record page ID 748. Did you wrap on the outside of this first door? Was it a storm door or a screen door? There was an interior door that was open. The screen door was unlatched, everybody agrees. Ajar Peters testified. He didn't wrap on it though. And he wrapped on the wall as he stepped through into an area. And I think the photographs are very helpful in this. Because you enter, it doesn't look like you're in someone's home. It looks like you're in an entryway, a foyer way to a building. There are stairs, you don't see the living area. And Richard's testimony is also helpful. Richard says people were always confusing. There were two doors, the downstairs door and the upstairs door. That was her testimony describing the building. Actually the photographs, the spatial arrangement there is so small, it does look as though you're stepping into an actual living unit instead of a hallway or some multi-unit foyer. I would respectfully disagree. Many, many times when a larger home has been converted into a multi-unit home, you are entering, when you enter in this area, all you see is a stairway. And you don't see any living area. And both Harris and Richard's testified, you don't enter their living area until you go up the steps, turn, go up the steps, and then you're in the living area. So for the officer who's arriving and who's knocking and announcing himself to try to find whether this person that they are looking for to take into thinking it's a multi-unit building, knocks, announces himself. It's very clear in the audio. He announces himself. He doesn't go into the living area. And to me under the Fourth Amendment, certainly under the qualified immunity test, that would be at worst a reasonable mistake, which should have been a ruling in his favor on the basis of qualified immunity. Let me ask you this. If we should decide that the entrance by the officer was illegal, how does that impact our evaluation of the legality of the shooting? Do we take into account that in evaluating the legality of the shooting, do we take into account whether the entrance was legal or not legal, or do we simply look at the circumstances of the shooting after the officer entered to decide whether or not the shooting was reasonable? It seems to me it certainly is a closer case if you conclude the entrance was unreasonable. I would firmly and strongly disagree with that conclusion. But I don't believe that that would alter the outcome with respect to the shooting. Even the cases that were cited by plaintiffs about shooting of dogs is very clear. First of all, the question of whether a dog is constitutionally cognizable property under the Fourth Amendment was there's no robust consensus of cases, no case from the Sixth Circuit at the time of this incident. In fact, this Court's decision recognizing constitutional weight to a shooting of a dog happened after this incident, and this Court said in that case this is a matter of first impression. So your position is that we don't look at the circumstances of the entry to decide whether the shooting that subsequently occurred was legal or not legal. We can make that evaluation without reference to whether the entrance into the building was legal. Is that your position? Yes. Okay. And do you have any cases to support that position? I think the cases that talk about officers knocking and announcing make very clear that they can do so, and I will look for the case. I believe in one of the cases the officers were on a side porch and there was an incident involving a dog that may have been not from this circuit. But regardless of what the Court thinks about the reasonableness of the entry and the shooting of the dog, because there was no robust consensus of cases, no case from the U.S. Supreme Court, no case until after this incident from this court, and no robust consensus from all the circuits about I'm asking for a case that would support your position that we could evaluate the circumstances of the shooting without reference to whether or not the entrance into the building was legal or not. Right. I will look and try to give you the case that I'm thinking of on rebuttal because it's not coming to my mind. But I think it's Let me just ask, just for one second, am I correct that in the Brown decision, which was 2016, the Court recognized that the constitutional right under the Fourth Amendment to not have one's dog unreasonably seized was clearly established in 2013? The Court said that, I recall. Am I mistaken about that? Let me go back and look. But my understanding is that Brown said it was a matter of first impression that there would be constitutional weight. And Brown came out after this incident. You might, on rebuttal I'll look at that again. I'll look at that again. The Court was pretty clear in terms of saying the right was clearly established in 2013. I'll look at that again. Let me ask you this while you're thinking about that. Is there anything in the record about the size of this dog, the weight of the dog? I know it's a pit bull, but they've come in lots of different weight ranges. It was a fully grown pit bull. And I think what's important about the reasonableness of the shooting as well is it's absolutely undisputed that the dog was right there, right there. The dog was growling. The dog was barking. In fact, Harris himself says he shot the dog, quote. Harris says the dog, this is a direct quote, was right there, right there by him, ready to bite him. That's what Harris said. And Harris also says he shot my dog, quote, because he thought my dog was going to bite him. Given that testimony by Harris, it seems to me the qualified immunity for a reasonable mistake is indisputable. Well, although Harris didn't actually witness the shooting, he rushed into the scene after he heard the shot. Wasn't that the way that happened? He was coming down the stairs, and so he did witness the shooting. He actually witnessed the shooting. He did. He did. He did. And so in that circumstance, there's no dispute.  The dog is growling. The dog is barking. Now, Harris says, well, but my dog was well trained. He wouldn't have shot him. Well, the officer doesn't know that. It's a pit bull, a notoriously dangerous dog. Yeah, that may or may not be. I'm not sure the record reflects that. So let's say it had been a, I don't know, a Cocker Spaniel coming down the steps full speed, exhibiting what is absolutely normal canine behavior for some stranger who has entered the premises. Dogs bark. They run down the steps. They're checking out the situation, barking away, running toward the police officer. It's a 25-pound Cocker Spaniel. Okay to shoot? If I could, let me change your hypo. I'd like to use my hypothetical if you would. I was going to use a shih tzu, a little tiny dog, a lap dog. You might have a closer question. Maybe it would even be a question of fact. But it seems to me when you have what's described as a full-grown pit bull growling, barking, and where the dog's owner, Harris, says he was right there, right there ready to bite, he shot my dog because he thought the dog was going to bite him. So in all of the issues we have before us, we have to construe the evidence in favor of the plaintiff. As I recall, Mr. Harris says that, number one, the door was actually latched and not ajar, and so we have to take his testimony as correct if I'm right about that. And then he says, Mr. Harris says, the dog never lunged and the dog never bit him. And Mr. Peters acknowledges he was never bitten. So what we're left with is a dog flying down the stairs because a stranger has entered, arguably without reason to be there. There's no warrant. There's no consent.  And so we have a dog flying down the steps, barking and growling. And you're saying basically because it's a pit bull, the dog deserved to be shot. It's not only I'm saying. All over the country in addressing constitutional claims involving the shooting of dogs have said pit bulls are unusually dangerous. There's a strong governmental interest in protecting our officers, allowing officers to protect themselves. Even those cases that have recognized from other circuits constitutional significance to a dog, which this court has only recently done, have said if there's an imminent threat, shooting the dog is permissible. And it would, in my view, be unreasonable to expect an officer with a pit bull coming at him where the plaintiff concedes he was right there, right there, ready to bite him. The officer shot the dog because he thought the dog was going to bite him. The officer doesn't have to wait. I mean, the thing about a pit bull that's important is the pit bull has a very strong jaw, and they have a kind of strength. We're not talking about a little nip of a lap dog here. So basically you're the rule of law. I mean, if it's a pit bull, you're saying it's an inherently dangerous animal, fully grown, which could be 30 pounds if you look at the specs for grown American pit bulls. I mean, they're anywhere from 30 to 70 pounds. So it could be a 30-pound dog as well. But because it's a pit bull as opposed to a cocker spaniel or some other dog that might be 30 pounds. I have a dog that was 25 pounds, cockapoo and poodle. And he would have come down the steps barking as well, and he wouldn't have bitten anybody. But anyway, this is the pit bull rule is what you're saying. Well, what I'm saying is I think the pit bull makes it an easy case. Okay. And the courts have found that. I see my time is up, and we haven't really addressed as much. Well, you'll have rebuttal. All right. Thank you. Good morning, Your Honor. Sean Cabot on behalf of the appellees. I'm going to be kind of scattered with my arguments. I'm going to try to address some of the questions that the court addressed during a sister counsel's argument. I think it's a dangerous course for the courts to basically carte blanche allow the shooting of a pit bull anytime that it's involving a pit bull. As I was sitting at a counsel table, I was thinking of Princess Pickles, my beagle dog, who as soon as there's a rabbit outside barks and growls and paws at the door and things like that. I don't think I've seen any case that would necessarily intimate or rule that a beagle dog is inherently dangerous. But, boy, she sounds bad. And I'd be scared if I was somebody. The facts here is that allegedly the pit bull was attacking, was growling and approaching the officer. Well, the district court did a very good job of analyzing that and cited a Michigan case that talks about growling, barking are natural responses of any dog. And I find it interesting in this case that when all the- Well, we were alarmed if a full-grown pit bull was barking and growling and coming at you. And I looked at the spatial appointments of the entryway. And if the dog was shot at the bottom of the steps, the officer and the dog had to be on top of each other at that time because there's just no space in there. Well, we're getting to the point with whether or not the officer should have been there in the first place. And legally, there's absolutely no reason for him to step through the threshold of that door. And, in fact- But then, legally, we have to consider if we can't have a rule, can we, where an officer can't defend himself if he's in a place illegally? Or do you have any case law that would address that? Well, I think, Judge Clay, I think it's important. In one of the cases that you sat on the panel for, the case of Brene versus Chartow, talked about where the Fourth Amendment draws the line. And in that case, it relied on the Payton versus New York case, which was a U.S. Supreme Court case from 1980. And in the Brene case, the panel wrote that the Sixth Circuit has said that the Fourth Amendment draws a firm line at the door. None of this would have happened if the officer wouldn't have gone past the front line of the door. That's, I mean, that's going back decades of law. But if you're going to use that case, you have to at least explain the factual circumstances. Well, in that case, there was, the officers arrived to a scene, there was some pushing and shoving at a door, and ultimately the perpetrator who was there didn't want to talk anymore to the police, shut the door. And then they tried to jar it open, and that's when the arrest ensued. So, again, I think it's very clear, in that case, the principle is the Fourth Amendment line is at that front door of the home. It was an apartment building and just a corridor there. The officer could legally step inside, right? I don't know that one because we don't have that situation in this case. But if the officer thought that was what it was, is that a factor? It's a factual question that I think the district court hit it right on the nail of the head. That has to be determined by the fact finder, not the court. The pictures that are in the record, as Your Honors noted very clearly early on in Sister Counsel's argument, it's very clear. 513, separate doorbell, separate mailbox, separate entrance, separate porch steps. 513, separate doorbell, separate mailbox, separate doorstep, separate little landing. There's nothing to indicate, like a lot of times when you're dealing with these multiplexes, you'll have maybe 513 and a half or 513A or 513B or 513C. You don't have any of that here. You've got a fourplex made out of a house, a one-family house at one time. Well, it seems to be one building. Now, when you look at the pictures, it certainly looks at, especially with respect to 511, because it's much smaller than the remainder of the building that maybe it was an add-on, but in essence one building, but clearly distinct entrances, clearly distinct markings as separate addresses and separate dwelling places. And so when you consider that, then you have to have the fact finder say, is his belief reasonable? And that's exactly what the district court said. And that's what the case law dealing with qualified immunity also dictates, that when qualified immunity and the granting or denial of that relies on material questions of fact, that has to be determined by the fact finder. Counsel, it may be that I'm misunderstanding your argument. And if so, I'd like you to let me know. It's your argument that if the officer enters illegally and in violation of the Fourth Amendment and is attacked by a pit bull, he cannot defend himself against that animal. But if he enters legally and not in violation of the Fourth Amendment, he can defend himself against the animal. Is that your argument? Well, I don't think that's the argument here in this case at all. No, but I'm asking you if that's your argument. At least that's what your argument implies. Well, I don't know, because that's not really the issue in this case. I think we might decide that it's the issue, so you should address the question. I think, first of all, he was not being attacked. And I think that's the sense that has kind of as the underlying purported inference that he was being attacked. There is no evidence he was attacked. In fact, he was growling and barking. That is not in the common sense of the word, I find it interesting that in the audio, no video in this case, but in the audio in the case, the officer, knowing that all there is is audio, and probably not knowing that the case would ever go further than that, says, the dog is biting me. But now there's a lawsuit. Now he comes to the realization that, well, I didn't go to the doctor. I didn't fill out an injury report. I didn't show anybody a puncture wound. No one took pictures. He was not attacked. So, otherwise, we're going to have to make a bright line rule that says every dog that barks and growls gets shot. And that flies in the face of not only cases in this circuit, but around the country. Aren't these, isn't this just a sort of classic issue for a jury to decide whether, I mean, the argument from the other side is you shouldn't have to, an officer should not have to wait until he or she is actually bitten by a dog. But it's up to a jury to decide in a situation like this whether it was reasonable, objectively reasonable for the officer to take the action he took in, quote, unquote, seizing this dog. I agree. I think that's the argument you're making. I agree. And that's, you know, going back to the district court's opinion. I mean, the district court was very clear that it could not make that decision, that that's a question for the fact finder. And again, going back to what I said a few moments ago, and when you look at the qualified immunity under Tolan v. Cotton and its fraud, he says when there's material questions of fact that are going to determine qualified immunity, it's got to go to the fact finder. It has to. The district court can't make that decision. So, I mean, I think the district court was absolutely on point on that. I'm curious to what your damages are here. Is it the value of the dog or emotional problems or something else? There's emotional problems. You know, they talked about not being able to sleep, nightmares. There's obviously the loss of the dog. And, again, that comes to the classic jury question, how much is that worth? I mean, it would be improper for me to say what that's worth, but that's not improper for the jury. And kind of going back to Judge Cole, your question about the Brown v. Battle Creek case, I actually had that in my notes and I was going to cite it to the court. Brown v. Battle Creek Police Department, 844 F3rd 556. Granted, it was a Sixth Circuit 2016 decision, but this is what the court said in that case, quote, The Supreme Court and this circuit have yet to decide this issue. Nevertheless, given the fact that every sister circuit has confronted this issue, has concluded that an individual has a property right in their dog and that a district court within this circuit has concluded the same, we hold that this right was clearly established in 2013 when the conduct in this action occurred. Notably, the case which I believe they were referring to was the Southern District of Ohio case going back to 2000, the Newsom v. Irwin case, 137 F2nd 934. And in as early as 2000, they said that a pet was property. So again, when you look at the qualified immunity analysis, that is exactly what we have. One, was it clearly established? Yes. You're right that the issue is not a matter of controversy about the dog, you know, not being something you should ordinarily interfere with or harm, but the Brown case kind of cuts against you because the shooting of the dog was approved by the court in that case. But I think, but it's going against what they say it wasn't clearly established. And in 2013, you have a court clearly saying pets were property. And that's the point. Whether or not they had a right to shoot it or not is irrelevant. The issue, we know the pet was property. I'm not sure you want to spend your time on that, but go ahead if you want. Well, I just, I wanted to address Judge Cole's question. He asked for the site and that's why I raised that. There was discussion about, on sister counsel's argument, that he saw the shooting. I don't think the record reflects that. On page 39 of Mr. Harris's deposition, the question's asked, did you ever hear the officer say, get your dog response? No, ma'am, never heard that, never heard that. And then the officer shot the dog, his response. I don't know how I'm going to be able to put this to you. I heard the door open, the screen door open. I heard the footsteps at the doorway. By that time, my dog runs downstairs and growling. At this time, I'm going to get my dog. By that time, I'm looking at the stairway and my dog's dead. So it doesn't appear that he saw the actual shooting. The other thing that I think is clear is that, you know, one of the things that, you know, Judge Clay, you mentioned a couple times about this spatial arena that we're dealing with in the foyer. The fact that it's a small area certainly gave Defendant Peters more than ample opportunity and means and time to get on the other side of that door, and he didn't. In fact, the record says in the video there was six seconds. Plenty of time for him to get out of there. The space is so confined and small, it doesn't look like a foyer. It just looks like an entryway that you step into at the bottom of the steps. I mean, if a dog is running down the steps and lunging and getting ready to, I wouldn't see that the officer had any time to get out of there. Well, I think there's a huge question. We're adding these words lunging and things. I mean, I think the record's clear that there was growling and barking. And again, if he's biting him or he's attacking him, as the defendant likes to allege or assert, again, you would think there'd be a rip in the pants or a tear mark on the pants. I mean, sister counsel said how strong these jaws are of a pitbull. We have nothing even on the clothing of this officer to indicate that that dog ever even touched his clothes. But again, it goes to the fact finder. So I don't know how this probably cuts both ways, and maybe there's further evidence that maybe this case should go to a jury. But there was testimony from Mr. Peters that he was, quote, sure at some point, unquote, he could have exited the apartment. But he did not feel he had time to exit after yelling for Harris to get the dog. But there was some period where he felt he could exit. Is that your understanding of the record? I know your time has expired. And I guess I would just succinctly say I think that factors into the six seconds that's on the audio, that he could have clearly escaped. And I see my time's up. But thank you, Your Honors, for hearing. No problem. Sorry about that. So a few points on rebuttal. What I'd like to focus on is the qualified immunity aspect, because I think it avoids a lot of the more difficult issues that the court has been questioning me about. And let's talk about the qualified immunity with respect to the entry. There is not a factual dispute here. What there is are undisputed facts that Peters believed he was entering the foyer of a multi-unit apartment. Both he and Officer Garcia testified without dispute that many, many homes in this area in the city of Jackson have multiple units, often without separate addresses, gas meters, other visible things. Walking, looking through the open door and seeing not a living area on the first floor, but merely a stairway gives a clear impression that this is part of an entryway to a multiple-unit apartment. I think anybody who's ever been in those kinds of buildings knows that there often is just stairs up to the upper levels. And that was what Officer Peters believed. Do you agree that that belief has to be reasonable? Yes, I think it is reasonable here. And it's a reasonable mistake of fact for him to have made, and there's no factual dispute about any of those points. So based on that, it seems to me he's entitled to qualified immunity. Then looking at the shooting of the dog, first of all, there is no authority that I'm aware of that says the officer has to wait until he's actually bitten or the officer isn't entitled to defend himself against a pit bull who is coming at him, biting at him, which is what his testimony was. And where Harris himself says he thought he shot the dog because he thought the dog was going to bite him. So there's no dispute about his reasonable belief in the face of a pit bull. You added biting at in that testimony, but don't we have to construe the evidence in the light most favorable to the plaintiff? And Mr. Harris says there was no biting at, that there was barking and growling. So the biting at part is something that will be decided by a jury. I think what Harris says is he didn't bite, he wouldn't have bit. Did he say biting at? I don't know that he used those words. I don't think that he said he wasn't biting at, and I do think he said very clearly that Peters thought he was about to be bitten. So based on those facts, it seems to me that qualified immunity applies. This isn't a jury question. And this Court and the Supreme Court have said over and over and over again that qualified immunity is intended to be broad, and in fact they've reversed appellate courts time and time again. When the appellate courts have issued decisions with a cramped reading of that protection, because the whole purpose of qualified immunity is to avoid the kind of chilling effect where an officer would say I'm not going to do my job because I'm going to be subject to suit in the after effect. I was trying to look at this knock and announce or being in a wrong place, and I'm not sure I found the case I was thinking of. But certainly Hardesty Township versus Hamburg and a number of other cases make the point, and this is part of this whole curtilage discussion, which I think is kind of a red herring, because the curtilage discussion, what the curtilage doctrine says is if you're searching in the curtilage, the courts have often held that to be impermissible, but they've also said when you're going to knock and announce, which this officer clearly was doing, which is why you hear the knocking, why you hear him say police, why he doesn't go any further, in that circumstance you can enter the curtilage. And in fact the courts have said you can even go in the backyard, go to the side porch, if you think people are there that haven't heard you. And that was certainly the case here. He thinks he's in the foyer of a multi-unit building. He knocks. He says police. He announces himself. All of that is undisputed. He didn't have a warrant, did he? He did not have a warrant. Just looking for this man that's had a problem. He had an order from the probate court and was told that this man would be at this building, and this was a man with mental health issues, schizophrenia, I believe, and who had gone off his meds and was viewed as a danger to himself and to others. So he was there to pick him up. He didn't have a warrant for the person he was looking for, and obviously he didn't have a warrant for this house. Right. And he wasn't engaged in a search. He was trying to find out if this guy was there in order to provide mental health services, which the court had said he needed. Okay. Thank you. Your time has expired. Obviously a very interesting case, and we very much appreciate both of your arguments today. Thank you so much. Your Honor, I'm sorry. You asked about Brown. That's all right. We can. Okay. Did you just want to take a second? I just was going to say the Brown court, you are correct, the Brown court does say as of 2-13 the right was clearly established, but it also, in the paragraph before that, and that was what I was focused on, says we decide this as a matter of first impression. I understand. Anyway, thank you. Thank you for your argument, and the case will be submitted. And that completes our argument calendar, so you may adjourn court.